**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**vs.**                                 **Cr. No.  11-2293JH**

**AGUSTIN AISPURO-HAROS,**

        **Defendant.**

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter is before the Court on Defendant Agustin Aispuro-Haros' Motion to Suppress [Doc. No. 28].   The motion has been briefed extensively, with the Defendant filing two supplemental memoranda in support of his motion and the United States filing responses to those supplements. *See* Doc. Nos. 31, 49, 54, 55, 56, 66, 68 and 69.  On January 18, 2012, the Court held an evidentiary hearing on Defendant's motion to suppress.   Elaine Ramirez represented the government, and Erlinda Johnson represented the defendant, who was present.  After the hearing, the Court permitted counsel to file written closing arguments.  *See* Doc. Nos. 74 and 75.  After considering all of the foregoing materials and evidence, the Court concludes that the motion to suppress should be granted.

**<u>BACKGROUND</u>**

In the fall of 2010, agents with the Drug Enforcement Administration (DEA) investigated a heroin trafficking organization.  Ex. 1; Tr. at 138.  The charges against Defendant stem from a search conducted at a home located at 325 Camino Cinco SW in Albuquerque, New Mexico, on August 3, 2011.  The search was conducted pursuant to a warrant that was supported by an affidavit

written and signed by Drug Enforcement Administration (DEA) Special Agent Christopher Godier. According to that affidavit, during an investigation conducted in the autumn of 2010, agents identified an individual suspected of being a heroin supplier, "CHINO Last Name Unknown" ("LNU").[1]  Ex. 1 at ¶ 7.  As a result, they executed search warrants at four locations in Albuquerque resulting in the seizure of large amounts of heroin and currency.  *Id*.  Chino was not present and has never been arrested.  *Id*.  Godier avers that a confidential source (CS) informed him that Chino and his first cousin, "CHOLO LNU," were both involved in heroin trafficking and that Chino had returned to Mexico, leaving Cholo in charge of distributing drugs.  Ex. 1 at ¶ 8.  The warrant affidavit contains no information regarding the reliability of the CS.  According to the affidavit, the CS said that Chino and Cholo are co-owners of the Nuevo Mexican American restaurant at 504 Old Coors Boulevard in Albuquerque and that Cholo's wife—described as a thin Hispanic woman named Adriana who has dyed blonde hair—works at the restaurant.[2] *Id*.

When agents entered the home at 325 Camino Cinco on August 3, 2011, they found three persons—the Defendant, Diana Garcia, and Armando Nunez-Hernandez—asleep in separate bedrooms.  In Defendant's bedroom, agents found a lock blade knife, a large sum of U.S. currency, a Mexican driver's license issued to Agustin Aispuro-Haros, a Sam's Club card issued to Defendant, several rolls of black electrical tape, a roll of vacuum seal plastic bags, a box of ziplock bags, a bag of rubber bands, a vacuum sealer, and 445.7 grams of suspected methamphetamine.

---

[1] The allegations set forth in this sentence and in the remainder of this paragraph are derived solely from Agent Godier's affidavit in support of the search warrant; at the hearing the Government did not present any evidence in support of these allegations.

[2] Sometime after he wrote his search warrant affidavit, Agent Godier discovered that the restaurant, which was located at 504 Coors Blvd in Albuquerque, was called the Westside Café, though a large sign on the building says "New Mexican & American Food."  Tr. at 140; Exs. 15, 16.

**FINDINGS OF FACT**

Based on the evidence presented at the hearing, as well as the Court's assessment of the credibility of the witnesses, the Court makes the following factual findings with regard to the Defendant's motion to suppress.

According to Godier's warrant affidavit, in January of 2011 agents conducted surveillance of the restaurant located at 504 Coors Boulevard SW in Albuquerque. Ex. 1 at ¶ 8. During their surveillance operations, they saw a female matching the confidential informant's description of Adriana, who was driving a gold Suzuki Grand Vitara. *Id.* Agents followed her to a house at 10301 Solitude S.W in Albuquerque. Parked in the driveway of that home, agents observed not only the gold Grand Vitara, but also a silver Lincoln Navigator bearing license plate LBC-905 and a white Nissan Maxima bearing license plate LDD-408. *Id.* The Lincoln Navigator belonged to Defendant but was registered to Diana Garcia at 325 Camino Cinco SW, Albuquerque. Tr. at 12-13; Ex. 11. There was a security camera in the second story window of the home overlooking the driveway and front yard. Ex. 1 at ¶ 8. On January 18, 2011, DEA Agent Gabriel Trujillo observed suspected drug packaging in the trash can in front of the Solitude home. Ex. 1 at ¶ 9. He did not remove it because he feared discovery by the occupants of the house, which would compromise the investigation. *Id.* As a result, the trash was not confirmed to be drug packaging material. On January 19, 2011, at around 4:00 a.m., an agent placed a global positioning system ("GPS") tracking device on yet another vehicle, a maroon Nissan Maxima, parked in the Solitude home's driveway. Ex. 1 at ¶ 10. Agents were unsuccessful in placing a GPS tracking device on the silver Lincoln Navigator. *Id.* They observed a male walk out of the Solitude home, approach the maroon Nissan Maxima and then return inside the house. *Id.* They continued surveillance until 8:00 a.m., when they observed three unidentified Hispanic men walk out of the Solitude home and look under the Lincoln Navigator.

3

*Id.* One of the men was holding the GPS tracking device that had been placed on the Nissan Maxima earlier in the morning. *Id.* This unidentified man threw the device on the ground, and then he and one of the other men drove away in the Nissan Maxima at a high rate of speed. *Id.* The third man returned to the Solitude home. After January 19, 2011, agents continued surveillance on the Solitude home. Ex. 1 at ¶ 11. They saw the silver Lincoln Navigator and the <u>white</u> Nissan Maxima being driven by two Hispanic males, as well as the Hispanic female driving the gold Grand Vitara. *Id.*

On February 1, 2011, Godier saw the Lincoln Navigator described above parked in front of the Westside Café. Tr. at 151. He saw a man get out of the car and go inside the restaurant, and then later exit the building and walk to a white Nissan Maxima parked in the same lot. Tr. at 152. The man conversed with a second man who was in the Nissan Maxima. *Id.* The driver of the Lincoln Navigator eventually returned to his vehicle and drove away, followed by law enforcement. *Id.* Officers from the Bernalillo County Sheriff's Department conducted a traffic stop of the Lincoln Navigator shortly after it left the Westside Café and identified Defendant as the driver. *Id.* They also deployed a narcotics canine to sniff the Navigator, and the dog did alert to the vehicle's center console. Tr. at 153; Ex. 18[3]. However, a manual search of the Navigator revealed no drugs. Tr. at 176-177. Agent Godier's affidavit in support of the search warrant did not mention this incident. Tr. 156; Ex. 1.

On February 24, 2011, agents went to the 10301 Solitude home and attempted to conduct a "knock and talk," hoping to obtain consent to search. Tr. at 84. One of the agents, Sergeant

---

[3] Exhibit 18, the canine handler's log, does not have a written date. Agent Godier testified that it was printed by an individual named Jeremy Bassett who was not able to get the log to print with the date information, but that he had confirmed that the log was in fact for February 1, 2011. Tr. 190-191.

Wayne Shelton of the New Mexico State Police, looked inside a trash can that was located in the driveway and observed what appeared to be drug packaging materials, including vacuum seal bags and cut plastic and tape in the shape of a shoe sole, which is a common packaging technique for smuggling heroin. Tr. at 85, 87; Ex. 1. The material was not confirmed to be drug packaging, and it was not seized. That same day, Godier and Trujillo went to the "Nuevo Mexican American restaurant" and made contact with Adrianna Castillo, who stated that she was the owner of the Grand Vitara. Ex. 1 at ¶ 12. She also said that she had spent the night on several occasions at the Solitude home, her boyfriend's residence. *Id*. Adrianna also said that she did not have keys to the Solitude house, could not grant permission to search it, and that she did not wish to speak to the agents any further. *Id*. After the conversation with Ms. Castillo, agents identified her residence as 1632 Bridge S.W., Albuquerque. *Id*. at ¶ 13-14. They also learned that on April 14, 2010, she had purchased a money counter from Sam's Club in Albuquerque. *Id*. at ¶ 13.

On March 17, 2011, Godier followed Adriana Castillo from the restaurant to 1632 Bridge S.W. and observed her go into apartment 31. Ex. 1 at ¶ 14. By contacting the apartment manager, agents learned that the apartment was rented to "Adrian Castillo" and that the previous address that Adriana listed in the rental documents matched that of the vehicle registration for the Grand Vitara. *Id*.

Agents continued periodic surveillance of the Solitude home. Eventually, agents determined the home on Solitude was vacant. Ex. 1 at ¶ 15. Between March and July 2011, agents conducted a few surveillance operations at the 1632 Bridge S.W. apartment. *Id*. Two Hispanic males frequented the apartment, and on several occasions, agents observed the same silver Lincoln Navigator with license plate LBC-905 parked in the apartment complex parking lot in the early morning hours. *Id*. Sgt. Shelton observed a Hispanic male leave apartment 31, remove a black bag

5

from the Lincoln Navigator, and then return to the apartment.  Agent Godier also saw a Hispanic

male arrive in the Navigator and go into apartment 31.  *Id*.

On July 19, 2011, after seeing the silver Lincoln Navigator parked in front of the Bridge

apartment, Sgt. Shelton placed a GPS tracking device on it; he did not have a warrant to do so.  Tr.

at 88, 178.  Sgt. Shelton observed the silver Lincoln Navigator going to 325 Camino Cinco on

approximately four occasions between July 20 and 27, 2011.  Tr. at 88-89; Ex. 1.  He knew that the

Navigator was registered to Diana Garcia, but he did not know who was driving it or who lived at

325 Camino Cinco.  Tr. at 89, 98.  At about 8:45 p.m. on the evening of July 27 and again at about

4:00 a.m. on July 28, 2011, Sergeant Shelton saw a dark grey Nissan Titan truck parked behind the

Camino Cinco address.  Tr. 68-69, 71, 92.   While he was there on the evening of July 27, Shelton

saw a man later identified as Armando Nunez walk from the residence pushing a trash can and

placing it near the road outside of the gate.  Tr. at 69, 92.  Also parked at 326 Camino Cinco that

night was an older green pickup truck belonging to Mr. Nunez.  Tr. at 70.  Shelton left at around

8:45 p.m, and then at about 4:00 a.m. on July 28, 2011, Shelton returned to 325 Camino Cinco with

Agent Thomas Maez.  Tr. at 71, 99.   Shelton observed that both the silver Lincoln Navigator and

a Nissan Titan truck with unknown license plate were parked in the driveway.[4]  Tr. at 95.  The pair

examined trash from the receptacle sitting on the curb in front of 325 Camino Cinco, removed

suspected drug packaging materials (including plastic packaging), and transferred it to his agency's

Region III office in Santa Fe for canine drug testing.  Tr. at 72-74, 93.  Agent David Duron of the

_____

[4] Shelton's testimony was at odds with Paragraph 17 of Godier's search warrant affidavit. Shelton testified that on the morning of July 28, 2011, it was too dark for him to read and confirm the license plate on the Nissan.  Tr. at 95.  However, in his affidavit Godier wrote that the "Nissan Titan bearing  New Mexico license plate JLM-691" was present in the driveway at 325 Camino Cinco.

New Mexico State Police then contacted Santa Fe Correctional Facility master canine handler Anthony Ramon, who came to Santa Fe with his canine, "Fito." Exs. 1, 5; Tr. at 163, 197. Ramon took two paper bags containing trash from 325 Camino Cinco outside to the parking lot and placed them on the ground under the rear bumper of a parked car. Tr. at 197. Then Ramon took Fito out of the back of his police car and walked the dog around a bit before leading him to the car in question. Tr. at 198. Fito stuck his head into each of the two bags, then sat down and looked up at Ramon, who then informed Duron that the dog had alerted to the presence of narcotics in the bags. Tr. at 198. Duron informed Shelton, his supervisor, who then informed Godier, that the dog had alerted on the plastic packaging material seized from the trash at 325 Camino Cinco. Tr. at 74, 182, 194, 196-197; Ex. 5.

While the search warrant for 325 Camino Cinco S.W. was signed by the Magistrate Judge on July 29, 2011, it was not executed until August 3, 2011. Six days had elapsed from the seizure of the suspected drug packaging material from the trash can found on the street in front of the Camino Cinco home to the execution of the search warrant (five days from the signing of the warrant to its execution). Diana Garcia owns the home at 325 Camino Cinco SW in Albuquerque, which she occupies with her common law husband. Tr. at 10. On August 3, 2011, Defendant was also staying at their home, with their permission. Tr. at 11. Defendant had been staying in the house for about six months, and he had a key. Tr. at 12. Authorities found no identification linking Defendant with any address within the United States. Tr. at 132. Defendant told Diana Garcia that he had a Mexican driver's license. Tr. at 20-21. On August 3, 2011, agents observed a black Volvo with a temporary tag parked at 325 Camino Cinco. Tr. at 128-129; Ex. 12. The driver's name on the tag was Oscar Baray Rodriguez, but Ms. Garcia told Agent Godier that the vehicle belonged to the Defendant. Tr. at 130. Yet another vehicle parked at 325 Camino Cinco, a Mitsubishi, bore a

temporary tag identifying Oscar Baray Rodriguez as the driver, yet Ms. Garcia told agents that the car belonged to the Defendant.  Tr. at 130-32; Ex. 13.[5]

The owner of the home at 10301 Solitude was Jose Alfredo Beltran, and the occupant listed on the 2009 lease agreement was Juan Rivas.  Tr. at 115-116, 121; Ex. 6.  After the written lease agreement terminated on November 1, 2009, the parties continued the lease on a month to month basis until July of 2011.  Tr. at 117-118, 122.  There is no evidence that Defendant was ever a resident or occupant of the home at 10301 Solitude.

After the August 3, 2011 search of Camino Cinco, Godier inquired with the New Mexico Department of Labor and learned that a business license for the Westside Café at 504 Coors was issued to Alfredo Andrade.  Tr. at 141, 173.  The New Mexico Department of Labor had no record of the Westside Café paying taxes on any wages, Tr. at 144, and a check on Adriana Castillo's social security number showed no wages earned from any source since 2007. Ex. 3; Tr. at 141, 146.  The Department of Labor had no record of Alfredo Andrade receiving any wages from the Westside Café either, though he did earn income in 2011 from a "mechanical company."  Tr. at 146-147.

On the morning of August 3, 2011, police encountered a man getting out of a grey Nissan Titan truck at the home at  325 Camino Cinco.  Tr. at 81.  He said that he owned the truck, and that he was getting in it to go to work.  *Id*.  Agent Joe Romero ran a check on the man's driver's license and identified him as Lorenzo Robles Flores.  Tr. at 80.  Agent Romero deployed a drug sniffing dog to the truck, but it did not alert.  Tr. at 83.

Finally, the Court has taken judicial notice of the Modified Pretrial Services Report in this

---

[5] At the hearing on the motion to suppress, Ms. Garcia testified that she told the agents that she did not know who owned the vehicles and that they were at her home because Defendant was cleaning them. Tr. at 23, 26, 29.

case.  It states, in relevant part, "ICE detainer issued: 08/03/2011."  Tr. at 297.

## ANALYSIS

An affidavit supporting a search warrant establishes probable cause for the warrant's issuance "if the totality of the information [in the affidavit] establishes the fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Roach*, 582 F.3d 1192, 1200 (10th Cir. 2009) (internal quotation marks omitted).  Courts do not require "hard evidence or personal knowledge of illegal activity [to] link a Defendant's suspected unlawful activity to his home."  *United States v. Biglow*, 562 F.3d 1272, 1279 (10th Cir. 2009) (internal quotation marks omitted).  Rather, "a sufficient nexus is established once an affidavit describes circumstances which would warrant a person of reasonable caution in the belief that the articles sought are at a particular place."  *Id.* (internal quotation marks omitted).

In this case, Defendant argues that various portions of the warrant affidavit must be excised, and therefore not considered, when determining whether the warrant supports probable cause to search the home at 325 Camino Cinco.  Defendant also argues that the good faith exception to the warrant requirement does not apply, and that by the time law enforcement officers conducted the search, the information in the warrant was stale.  The Government, in turn, disputes the Defendant's standing to challenge the search.  The Court will address the Government's argument first.

## I.      STANDING

### A.      Immigration Status

The Government argues that Defendant is in the United States illegally (even suggesting that he is a previously deported felon, *see* Doc. 31 at 17), and as such he is not entitled to the protection of the Fourth Amendment's prohibition against unreasonable searches and seizures.  This thorny constitutional issue, in turn, raises two threshold questions: first, what is the exact nature of

9

Defendant's immigration status and second, who bears the burden of proof on the issue?  Only after those questions are answered must the Court turn to the question of whether the Fourth Amendment extends to aliens who are illegally within the United States.

As to the first question, there is little evidence in the record regarding Defendant's immigration status.  At the Government's request, the Court has taken judicial notice of the Modified Pretrial Services Report regarding Defendant.  That report states that Defendant's place of birth is "Mexico."  As the Government points out, a box on the form that says "ICE detainer Issued: 08/03/2011" has been checked.  However, just above that a box labeled "Foreign citizenship and/or illegal alien" has *not* been checked.  Additionally, there was testimony at the hearing to the effect that Defendant had a Mexican driver's license, Tr. at 12, and that for the three years before his arrest he was living in the United States and did not return to Mexico, *id*. at 13, 17-18.  That is the sum total of the evidence currently before the Court.  There is no evidence that the Defendant has previously been convicted of a felony or that he has been previously deported.  The Court concludes that while it may raise a question regarding Defendant's immigration status, this evidence is far from sufficient to support a conclusion as to whether or not Defendant is in this country illegally, that he has been convicted of a felony, or that he has been previously deported.  Neither party has submitted evidence or legal authority as to the full import of the issuance of an ICE detainer, and the record is devoid of evidence of any immigration proceeding involving Defendant that may or may not have occurred.

Perhaps recognizing that the evidence before the Court is inconclusive, the Government argues that the burden is on the Defendant, as the party moving to suppress evidence, to come forward with evidence to show that he has an interest in the searched premises that the Fourth Amendment was designed to protect, and that this includes evidence of his lawful status in the

United States.  The Government points out that, generally speaking, a defendant has the burden to show that he has standing to challenge a search of his abode.  While this is true, cases reaching that conclusion have generally addressed the question of whether the defendant had a reasonable expectation of privacy in the place that was searched.  This inquiry, in turn, has generally centered around the defendant's connection to the specific searched premises as owner, occupant, or authorized guest, and not to the defendant's right to claim Fourth Amendment protection in light of his immigration status.  *See, e.g., Kyllo v. United States*, 533 U.S. 27, 33-34 (2001); *United States v. Creighton*, 639 F.3d 1281 (10th Cir. 2011) (concluding that a defendant who shared hotel room with room's registered occupant lacked expectation of privacy in room after registered occupant failed to vacate room upon expiration of rental period, and thus defendant lacked standing to challenge police officers' warrantless entry into room); *United States v. Thomas*, 372 F.3d 1173, 1176 (10th Cir. 2004) (holding that a social guest has Fourth Amendment standing to challenge a search of his host's home).

        To this Court's knowledge, no court has squarely addressed the question of whether a defendant who is challenging a search on Fourth Amendment grounds has the burden of proof regarding his immigration status.  There are, however, decisions from other districts within the Tenth Circuit that have examined related issues.  For example, in *United States v. Esparza-Mendoza*, 265 F. Supp. 2d 1254 (D. Utah 2003), the Government came forward with evidence that the defendant was a Mexican citizen who illegally entered the United States, was convicted of a felony in state court, and was then deported.  *Id*. at 1255.  The Government also introduced evidence that sometime thereafter, the defendant illegally reentered the country and thereafter the events subject to the motion to suppress took place.  *Id*. at 1256.  Relying on Supreme Court decisions, particularly

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) [6], as well as the text, structure, and history

of the Fourth Amendment, the Utah District Court concluded that as a previously deported felonious

alien, the defendant was not one of "the People" that the Fourth Amendment was designed to

protect. *Esparza-Mendoza*, 265 F. Supp. 2d at 1273-74. The court described its ruling as "a

categorical determination about previously deported aliens. In other words, an individual previously

deported alien felon is not free to argue that, in his particular case, he possesses a sufficient

connection to this country to receive Fourth Amendment coverage (unless, of course, he could prove

he was in this country lawfully)." *Id.* at 1271. The court expressly made no determination as to

"whether illegal aliens who have not been deported likewise lack [] a sufficient connection. The

case law appears to recognize an ascending scale of rights for aliens. Whether illegal aliens who

have not previously been deported are distinguishable from alien felons who have been deported is

a question that can await another day." *Id.* at 1273. On appeal, the Tenth Circuit affirmed the Utah

District Court's decision on other grounds, declining to examine the question of the applicability of

the Fourth Amendment to previously deported illegal alien felons. *United States v. Esparza-*

*Mendoza*, 386 F.3d 953, 955 (10th Cir. 2004). Two years after *Esparza-Mendoza*, the Utah District

---

[6] In *Verdugo-Urquidez*, a Mexican defendant challenged the warrantless search of his
residence in Mexico by American law enforcement officials while he was in custody in the
United States. The Supreme Court held that the defendant, who had no voluntary attachment to
the United States, did not enjoy the protection of the Fourth Amendment. 494 U.S. at 274-75.
The Court reasoned, in part, that the phrase, "the people" in the Fourth Amendment is a term of
art that "refers to a class of persons who are part of a national community or who have otherwise
developed sufficient connection with this country to be considered part of that community." *Id.*
at 265. The facts in *Verdugo-Urquidez* are dramatically different from those presented here.
First, unlike in *Verdugo-Urquidez*, the home that authorities searched was in the United States.
Second, it appears that Defendant was in the United States voluntarily (if, perhaps, not lawfully),
while Verdugo-Urquidez was arrested in Mexico and brought to the United States while in
custody. Both of these distinguishing facts played a central role in the Supreme Court's
reasoning.

Court returned to the issue in *United States v. Atienzo*, 2005 WL 3334758 (D. Utah Dec. 7, 2005) (unpublished).   In *Atienzo*, the defendant was a previously deported alien, though he was not a felon. *Id*. at *1.   The Utah District Court found the defendant's lack of felony conviction to be a distinguishing fact that removed the case from the rule it announced in *Esparza-Mendoza*.   The court held that "with respect to illegal aliens who are not felons, the decision whether they fall outside the Fourth Amendment would seem to require a case-by-case determination." *Id*. at *4.   In *Atienzo*, the defendant produced evidence of his connections to the country through his acceptance of societal obligations, such as payment of state and federal taxes, payment of child support for his three young American children, and almost continuous residence in the United States for approximately nine years.   *Id*. at *5.   The Government argued categorically that the Fourth Amendment's protections did not extend to the defendant—a position that the court rejected—but it did not dispute his evidence of substantial connections to the country.   *Id*.   In the absence of such a dispute, the *Atienzo* court assumed that the Fourth Amendment's protections applied to the defendant.   *Id*.

More recently, the Kansas District Court examined the issue in *United States v. Gutierrez-Casada*, 553 F. Supp. 2d 1259 (D. Kan. 2008).   There, the Government came forward with, and the court took judicial notice of, evidence of defendant's prior felony conviction for possession of narcotics and his subsequent order of deportation to Mexico.   *Id*. at 1261.   The defendant failed to offer any evidence disputing his status as a previously deported felon who had reentered the country illegally.   "Because the record in the present case lacks any evidence that this previously deported felonious defendant was legally present in the United States at the time of the search, he cannot establish a connection substantial enough to invoke the protection of the Fourth Amendment." *Id*. at 1266.   The court went to lengths to distinguish such persons from "illegal aliens in the United

13

States who are merely suspected of a crime" and made no determination regarding the Fourth Amendment rights of the latter group.  *Id*. at 1272.

The foregoing cases suggest to this Court that, in order to support an argument that the Fourth Amendment does not apply to the Defendant, it is the Government that bears the burden of demonstrating that he is in the country illegally, has been convicted of a felony, and has been previously deported.[7]   Once the Government meets that burden, then the burden shifts to the Defendant to show that he has sufficiently accepted societal obligations such that he has a substantial connection to this country.  Here, the Government has not met its burden.  There is nothing in the record that would even suggest that Defendant is a felon who has been previously deported.  At most, there is a suggestion, and merely a suggestion, that Defendant may have entered the country illegally.  Accordingly, the Court concludes that on the record presently before it, the Fourth Amendment does apply to the Defendant.

**B.      Search at 10301 Solitude SW**

A defendant has the burden of establishing his standing to challenge a search of a residence or other place of abode.  Specifically, the defendant must demonstrate that he has a subjective expectation of privacy in the abode that society is prepared to recognize as reasonable. *See, e.g., United States v. Poe*, 556 F.3d 1113, 1121 (10th Cir. 2009).

The Government argues that Defendant lacks standing to contest the agents' search of the

---

[7] At this time the Court expresses no opinion as to whether the Government must show all three of these in order to create the presumption that the defendant does not enjoy the protections of the Fourth Amendment, or if it is enough merely to show that the defendant is in the country illegally.  Given that the Government has not demonstrated any of the three, the Court need not decide that question.  It is worth noting, however, that in the cases discussed *infra*, the courts declined to find categorically that illegal aliens who were not previously deported felons had no Fourth Amendment rights.

14

trash at 10301 Solitude because he has failed to demonstrate any connection between himself and

that residence.  The Government contends that even if the trash was within the curtilage of the home

at 10301 Solitude, Defendant cannot challenge the search because he had no reasonable expectation

of privacy in the home or its curtilage.  The Court agrees.  The record contains no evidence that

Defendant was either an owner, lessee, resident, or invited guest at the home when the agents looked

into the trash container on January 18 and February 24, 2011.  Accordingly, he lacks standing to

challenge those searches.

### C.    Search at 325 Camino Cinco

It appears that the Government's argument regarding Defendant's standing to challenge the

search of the Camino Cinco residence turns solely on his illegal entry into the United States.  The

Government clarified  that it does not contend, as it does with 10301 Solitude, that Defendant lacked

a connection with the premises sufficient to convey a reasonable expectation of privacy in the home.

*See* Doc. 56 at 3.[8]  Therefore, for the reasons outlined above, the Court concludes that Defendant

had standing to challenge the search of the home at 325 Camino Cinco.

However, the Government does contend that Defendant cannot contest the dog sniff of the

packaging materials found in the trash outside 325 Camino Cinco because the trash receptacle was

outside the curtilage of the home.  Under the Government's reasoning, Defendant's lack of privacy

interest in the seized trash deprives him not only of the right to contest the seizure, but also of the

right to argue that the dog sniff was unreliable because the canine was not properly trained and

---

[8] Even if the Government were making that argument, the uncontradicted evidence shows
that on August 3, 2011, Defendant was staying at 325 Camino Cinco with the permission of the
owners. Tr. at 11.  Defendant had been staying in the house for about six months, and he had a
key. Tr. at 12.  His status as an invited overnight guest is sufficient to convey standing to contest
the search. *See, e.g., United States v. Poe*, 556 F.3d 1113, 1122 (10th Cir. 2009).

certified.

Under well-settled Fourth Amendment jurisprudence, the privacy expectation that one has in the home generally extends to the home's "curtilage." *See, e.g., Kyllo v. United States*, 533 U.S. 27, 34 (2001); *Oliver v. United States*, 466 U.S. 170, 180 (1984); *Reeves v. Churchich*, 484 F.3d 1244, 1254 (10th Cir. 2007). "Curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Lundstrom v. Romero*, 616 F.3d 1108, 1128 (10th Cir. 2010) (brackets omitted) (quoting *Reeves*, 484 F.3d at 1254) (internal quotation marks omitted). In determining whether an area around a home is within the "curtilage," the court generally considers four factors: "(1) the area's proximity to the home; (2) whether the area is included within an enclosure surrounding the house; (3) the manner in which the area is used; and (4) the steps the resident has taken to protect the area from observation." *Id*. Here, the trash receptacle was left near the roadway outside of the gate that enclosed the home. Tr. at 69, 92. There is no evidence that the occupants took any steps to protect the area from observation. Rather, it was an open area outside the fence, and they stated that they often let their neighbors use the trash bins. *See* Affidavits of Diana Garcia and Armando Nunez-Hernandez, Exs. A and B to Doc. 49. Based on the foregoing, the Court concludes that the trash container was outside the curtilage of the home at 325 Camino Cinco, the Defendant lacks a reasonable expectation of privacy in the trash, and therefore he may not challenge the search of the bin and seizure of items found therein. Thus, the Government may introduce at trial evidence (e.g., testimony, photographs) of the items seized from the trash at 325 Camino Cinco.

The Government takes the argument a step further, however, by contending that Defendant cannot "raise any issue regarding the canine alert" that took place when Fito sniffed the trash pulled from the bin at 325 Camino Cinco. Doc. 66 at 11 n.2. Specifically, the Government argues that

16

because he lacked a privacy interest in the trash, Defendant also may not argue that the dog alert should be excluded as grounds for probable cause because the narcotics canine is unreliable.  The Government cites no cases in support of its position.  The Defendant contends that because he has standing to challenge the search warrant for 325 Camino Cinco, as part of that challenge he may contest the reliability and validity of the dog Fito's alert to items suspected of being drug wrappings, because that alert formed part of the basis for a finding of probable cause to search.  Doc. 69 at 10.

The Court agrees with the Defendant that he may challenge the dog sniff—not on the grounds that the sniff itself violated his Fourth Amendment right to privacy, but rather on the grounds that the canine was not properly certified and therefore his alert could not serve as a basis for a finding of probable cause to search 325 Camino Cinco.  The exclusion of items found as a result of a warrantless search within the curtilage of the home stems from the need to protect reasonable expectations of privacy which society is willing to recognize as legitimate.  On the other hand, the Supreme Court has held that canine sniffs are less intrusive than a typical search used to determine the presence of contraband, and therefore the practice of using trained dogs to sniff baggage at airports does not constitute a search.  *United States v. Place*, 462 U.S. 696,  707 (1983). And, to the extent the presence of narcotics is revealed by a canine sniff, the Supreme Court has held that "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.'"  *See Illinois v. Caballes*, 543 U.S. 405, 408–09 (2005) (emphasis in original) (holding that a canine sniff during a traffic stop is not a search (quoting *United States v. Jacobsen*, 466 U.S. 109, 123 (1984)).  "This is because the expectation that certain facts will not come to the attention of the authorities is not the same as an interest in privacy that society is prepared to consider reasonable."  *Id.* at 408–09 (internal quotation marks omitted).

17

However, the grounds upon which Defendant wishes to challenge the dog sniff do not arise from privacy concerns, but rather from concerns regarding the accuracy of the canine's alert which formed at least some portion of the probable cause determination for the search warrant at issue. In the Court's view, the dog alert is akin to laboratory test to determine if residue found in the trash contained a controlled substance.  In the case of such a laboratory test, the Defendant would be permitted to challenge the accuracy of the results on the grounds that, for example, the laboratory or the chemist was not properly trained and certified.  It is no different here.  Thus, the Court rejects the Government's contention that Defendant lacks standing to challenge the canine sniff of the trash removed from 325 Camino Cinco.  The Court addresses the merits of that challenge below.

## II.   WHAT INFORMATION, IF ANY, SHOULD BE EXCISED FROM THE SEARCH WARRANT AFFIDAVIT?

### A.   THE TIP FROM THE CONFIDENTIAL INFORMANT

Probable cause to search requires "a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Cooper*, 654 F.3d 1104, 1124 (10th Cir. 2011) (quotations omitted).  Where, as here, probable cause is based on an informant's tip, the court makes a probable cause determination based on the totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge. *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983); *United States v. Quezada–Enriquez*, 567 F.3d 1228, 1233 (10th Cir. 2009).  "These factors are not absolute, independent requirements that must be satisfied in order for probable cause to exist.... [A] deficiency in one factor may be compensated for by a strong showing of another or by other indicia of reliability."  *Quezada–Enriquez*, 567 F.3d at 1233 (citation omitted). An informant's tip which provides "highly specific or personal details from which one could reasonably infer that the

informant had firsthand knowledge about the claimed criminal activity" is more likely to be found sufficient to support probable cause. *Id.* (quotations omitted). Further, an informant's tip is more reliable if it is confirmed by officers' independent observations. *See United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004) (informant's tip that narcotics are being distributed at a particular location can be corroborated through "controlled buy" at that location).

Here, as Defendant correctly points out, the warrant affidavit contains no information about the reliability or veracity of the confidential source, nor about the basis of his knowledge. However, the agents were able to corroborate much of the information provided by the CS. For example, the agents went to the restaurant and observed a thin, blonde, Hispanic woman matching the CS's description of Cholo's wife, whom the CS called Adriana, working there. Upon interviewing her, the agents were able to confirm that the woman's name was Adriana Castillo. Their investigation revealed that on April 14, 2010, she had purchased a money counter at Sam's Club and given as her address 1632 Bridge SW, Apartment 31. The apartment manager told the agents that Apartment 31 was rented to "Adrian Castillo." Finally, agents followed Adriana Castillo from the restaurant to a residence at 10301 Solitude. They surveilled the home at 10301 Solitude between January 18 and February 24, 2011, and on two separate occasions they observed suspected drug packaging materials in a trash can located in front or to the side of the house. These included vacuum seal bags, cut plastic and tape in the shape of a shoe sole, which is a common packaging technique for heroin smugglers. In short, the agents were able to confirm Adriana's appearance and identity, as well as reveal information consistent with the CS's assertion that Adriana was closely associated with a drug trafficking organization. As a result, the Court concludes that the forgoing observations by the investigating agents constitutes sufficient corroboration to support the credibility of the CS's tip such that the tip should not be stricken from the affidavit.

19

## B.     **THE DOG ALERT**

"[A] drug dog's alert establishes probable cause only if that dog is reliable." *United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011).  "As a general rule, a search warrant based on a narcotics canine alert will be sufficient on its face if the affidavit states that the dog is trained *and certified* to detect narcotics." *United States v. Kennedy*, 131 F.3d 1371, 1376–77 (10th Cir. 1997) (citations omitted) (emphasis added). The Tenth Circuit does not require "affiants to include a complete history of a drug dog's reliability beyond the statement that the dog has been trained and certified to detect drugs." *Id*. at 1377.  Under *Franks v. Delaware*, 438 U.S. 154 (1978), a court may look beyond the affidavit to see whether it omitted material information about a particular dog's reliability that would negate probable cause.  *See id.*  (The Court discusses *Franks* in greater detail below.)   As the Tenth Circuit has explained, the court need not "mount a full-scale statistical inquisition" into the drug dog's history. *United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011).  "Instead, courts typically rely on the dog's certification as proof of its reliability," given that "canine professionals are better equipped than judges to say whether an individual dog is up to snuff."  *Id*.  Of course, "if a credentialing organization proved to be a sham, its certification would no longer serve as proof of reliability." *Id*. (citations omitted). In other words, the judicial task is limited "to assessing the reliability of the credentialing organization, not individual dogs." *Id*.  On the other hand, the Tenth Circuit has recognized that in certain situations, a narcotics-detection dog's reliability can be established by means other than proof of certification.  *See Ludwig*, 641 F.3d at 1251 n. 3 ("An uncertified dog's accuracy could still, in theory at least, be established by examining its training history and record for reliability."); *Clarkson*, 551 F.3d at 1204 ("While successful completion of a training course and a current certification would be satisfactory, we do not exclude the possibility that reliability can be established by other evidence.").

20

Here, Agent Godier's affidavit states that "Officer Ramon advised that Fito is trained to alert to the presence of illegal narcotics." Ex. 1 at ¶ 18. The affidavit does not state that Fito has been certified in narcotic detection. At the evidentiary hearing on Defendant's motion to suppress, the Government was unable to prove that Fito had been properly certified. The Government did produce a memorandum dated January 12, 2012 (less than a week before the hearing) by Sergeant Eric Padilla of the Las Vegas, New Mexico Police Department. Ex. 4. In that memorandum, which is unsigned and unsworn, Sergeant Padilla writes that on October 28-29, 2010, he was a canine evaluator during an annual canine recertification event at Camp Sierra Blanca in Fort Stanton, New Mexico. Ex. 4. The memorandum states that both K-9 handler Anthony Ramon and his dog Fito passed the "narcotics and patrol aspect of the recertification."[9] *Id*. The memorandum does not state that Sergeant Padilla or anyone else actually certified Ramon and Fito, however. In addition, Sergeant Padilla did not testify at the hearing. In light of that fact, Padilla's unsigned, unsworn memorandum, written well over a year after the events it purports to document, carries little weight. Similarly, a "Corrections Academy Training Certificate" from the State of New Mexico Corrections Department dated October 28, 2010 states that Ramon and K-9 Fito successfully completed the New Mexico Corrections Department annual canine certification in narcotics detection. Ex. G. However, the certificate appears to be signed by Anthony Ramon himself as the K-9 Master Trainer issuing the certification. Defendant offered the testimony of Andre Falco Jimenez, owner of the Falco Canine Academy in Brea, California, which trains police dogs nationwide. Tr. at 263-264. Mr. Jimenez is a former police officer and canine handler, and he is currently a certified state evaluator

---

[9] This sentence in the memorandum leaves the Court to wonder if there is an aspect of the certification other than narcotics and patrol that Ramon and Fito did not pass. However, the memorandum does not answer this question.

of police dogs trained in narcotics detection.  Tr. at 265.  He has been recognized by courts as an expert in canine training and handling approximately 16 times.  Tr. at 267.  Jimenez testified—quite credibly, in this Court's opinion—that a certification signed by the canine handler himself is not a valid certification.  Tr. at 274-275, 282.  The reasons for this are obvious.  A certification should be issued by an objective third party; a system that allows individuals to certify themselves leaves ample room for abuse.  In addition, the Government did not provide to Defendant or offer into evidence (nor was Jimenez able to find) any information regarding the canine training academy at the New Mexico Department of Corrections.  Tr. at 275.  Thus, Jimenez could not evaluate the quality of the training that Ramon and Fito received because he had no information regarding the identity and experience of the trainer, nor the types of substances used for the training.  Tr. at 275-276.

Finally, *Ludwig* states that, as an alternative to proper certification, the Government may establish the reliability of a narcotics-detection canine through evidence of the dog's training history and reliability record.  *Ludwig*, 641 F.3d at 1251 n. 3.  Here, as the Defendant points out and as Jimenez testified, the sparse training and deployment records regarding canine Fito do not contain adequate information to properly assess his training or reliability.  Ex. H. Tr. at 268-273.  There is no evidence documenting Fito's ongoing training or his accuracy record in the field.  Indeed, Fito's official file contains no documentation showing that he was actually deployed on July 28, 2010.

In light of the foregoing, the Court cannot conclude that Fito was reliable.  The record lacks evidence of Fito's proper certification and of his reliability in training exercises or in the field.  Accordingly, the Court will not consider Fito's alert when determining whether Agent Godier's affidavit supports probable cause to search 325 Camino Cinco.

C.   **GPS DATA**

It is undisputed that the placement of a GPS tracking device on the Lincoln Navigator was done without a warrant.   After the placement of the device and after the evidentiary hearing on Defendant's motion to suppress, the Supreme Court issued its opinion in *United States v. Jones*, — U.S. –, 132 S. Ct. 945 (2012).  In that case, the Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search,'" and therefore the warrantless use of the GPS device was improper.  *Id*. at 949.  As a result, in this case the Government has conceded that "the information collected as a result of the placement of the GPS device on the Lincoln Navigator was unconstitutional." Doc. 75 at 7.  The Court concurs.  Under *Jones*, the use of a GPS device on the Lincoln Navigator was an improper  warrantless search.

However, the Government argues that the exclusionary rule should not apply here because the investigating law enforcement agents were merely relying in good faith upon established case law from other federal courts outside the Tenth Circuit that permitted warrantless use of GPS devices. The Court discusses the application of the good faith exception in Section III, *infra*.

D.   **ALLEGED OMISSIONS AND MISREPRESENTATIONS IN THE WARRANT AFFIDAVIT**

A search warrant must be voided and the fruits of the search suppressed where a court (1) finds that the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant and (2) concludes, after excising such false statements and considering such material omissions, that the corrected affidavit does not support a finding of probable cause.  *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978); *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997).  Under *Franks* a district court must hold

23

a hearing to explore the sufficiency of the affidavit if the defendant makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant" and that "the allegedly false statement [was] necessary to the finding of probable cause." *Id*. at 155–56. Defendant offers four examples of material misrepresentations or omissions in Godier's warrant affidavit.

### 1.   Name and Ownership of the Restaurant

Defendant argues that the warrant misrepresented to the magistrate judge that the restaurant located 504 Old Coors SW in Albuquerque was called the Nuevo Mexican American Restaurant and is owned by drug traffickers Cholo and Chino. Defendant asserts that he has proven the falsity of these statements by demonstrating that the restaurant is actually called the Westside Café and is owned by Alfredo Andrade. The Court disagrees that the errors, to the extent they exist, are material. First, the Court concludes that the CS's mistake as to the name of the restaurant is not material. While there is a sign on the restaurant that reads "Westside Café," photographs of the building show two large signs that read "New Mexican & American Food." Exs. 15 and 16. The confusion generated by these signs is understandable. More importantly, it is not material. Had the magistrate judge had access to these photographs of the restaurant and been apprised of the knowledge that the CS had wrongly called the restaurant the "Nuevo Mexican American Restaurant" instead of the Westside Café, it would not have altered her probable cause analysis.

Similarly, the Court does not agree that the warrant affidavit contains a deliberate or recklessly false statement as to the ownership of the restaurant. The affidavit reports that the CS stated that the restaurant was owned by Cholo and Chino. Defendant points to evidence from the New Mexico Department of Taxation and Revenue that shows the restaurant to be owned by Alfredo Andrade. Ex. D. This, by itself, does not contradict the CS's statement, as there is no way to know

if Alfredo Andrade goes by the nickname Cholo or Chino, or if he is the owner of the restaurant in anything but name.  When Godier interviewed Andrade, he said that his aunt, Adriana Castillo, worked there, but he said he did not know if his own mother, with whom he lives, worked there. Tr. at 113, 148-149.  Andrade could not identify the bank where profits from the restaurant were kept, nor could he identify any restaurant employees other than his aunt, who he identified as the girlfriend of the Defendant.  Tr. at 114, 148-149.  The New Mexico Department of Labor provided Godier with documents showing that neither Adriana Castillo nor Alfredo Andrade reported receiving any income from the restaurant.  Ex. 3; Tr. 144, 146-147.  These facts significantly undermine the contention that Andrade was the owner of the Westside Café.  Finally, Adriana Castillo told Godier that $2,500 seized from the Defendant's wallet at the time of his arrest was intended to pay the rent at the Westside Café, Tr. at 147, which supports the inference that Defendant has an ownership interest in the business.  In light of the foregoing, the Court cannot conclude that the warrant affidavit contained a material omission or falsehood as to the ownership of the Westside Café.  The foregoing evidence does not demonstrate that the CS's information was incorrect or that Godier misrepresented what the CS told him.

## 2.   February 1, 2011 Traffic Stop of Lincoln Navigator

The warrant affidavit does not inform the magistrate judge that on February 1, 2011, police conducted a traffic stop of the Lincoln Navigator after it left the Westside Café, that Defendant was driving the vehicle, and that a search of the car revealed no illegal drugs.[10]  Defendant argues that this information, had it been included in the affidavit, would have undermined a finding of probable

---

[10] Agent Godier testified that he did not include the February 1, 2011 traffic stop in his affidavit because he believed that without it he still had adequate facts to support a finding of probable cause to search 325 Camino Cinco.  Tr. at 156-157.

cause to search 325 Camino Cinco because the affidavit falsely implied that the Lincoln Navigator

and its driver were involved in drug trafficking.  In response, the Government points out that while

no illegal drugs were found in the vehicle, the DEA narcotics canine Blaze did alert to the center

console.[11]   The Government cites *United States v. Kennedy*, 131 F.3d 1371, 1375 n. 6 (10th Cir.

1997), wherein the Tenth Circuit stated that "a false alert does not mean necessarily that the dog

alerted without detecting any odor of narcotics.  Dogs are capable of detecting narcotics residue that

may appear on money or clothing that has come in contact with drugs, even though no seizable

quantity has been found."  *See also United States v. Bertram*, 307 Fed. Appx. 214, 217 n.1 (10th Cir.

Jan. 13, 2009) (unpublished) ("Certainly in the instances where Taz alerted in the field, but no

discernible drugs were subsequently found by the human officers, it is possible that the dog was

reacting to the scent of drugs that were no longer present.").  As a result, the Government suggests

that the dog's alert supports the inference that narcotics had been in the Navigator at one time and

contends that the February 1, 2011 traffic stop actually supports probable cause to search 325

Camino Cinco, where the vehicle had been spotted overnight.

        The Court agrees with the Government on this issue.  If the fact that a physical search of the

Lincoln Navigator revealed no drugs is material to issue of probable cause, then so is the fact that

a certified narcotics canine alerted to the interior of the vehicle.  Assuming (without deciding) that

Defendant has met his burden under *Franks* to show that Godier should have included the February

1, 2011 traffic stop in his search warrant affidavit, the Court concludes that all of the information

regarding the stop actually tends, however slightly, to support a finding of probable cause to search

325 Camino Cinco.

---

        [11] The Government has provided evidence of the canine's certification in narcotics
detection, Ex. 17, and Defendant does not challenge his reliability.

### 3.    Observation of the Nissan Titan at 325 Camino Cinco

Defendant argues that the warrant affidavit misrepresents that agents saw a gray Nissan Titan truck parked at 325 Camino Cinco which they had previously seen parked near an apartment rented to "Adrian Castillo," at 1632 Bridge SE in Albuquerque.  According to Defendant, he has proven this to be a misrepresentation because Lorenzo Robles, the owner of the Nissan Titan, told his investigator that he has never driven his truck to 325 Camino Cinco and that he drives the truck only on the weekends.  Ex. C.  Defendant also argues that the GPS data (already found to be obtained in violation of the Fourth Amendment) never showed the Lincoln Navigator to be at 325 Camino Cinco, but rather located at other addresses on Camino Cinco.

The Court concludes that Defendant has failed to meet his burden under *Franks* to show that Godier's statement was knowingly false or in reckless disregard of the truth.  Instead, all that Defendant has done is illuminate the presence of a fact issue as to whether the truck was at 325 Camino Cinco, and who may have driven it there.  There is ample evidence to conclude that the warrant affidavit correctly stated that the Nissan Titan was present at 325 Camino Cinco.  Sergeant Shelton testified credibly to seeing the Nissan Titan truck (Ex. C-1) parked at 325 Camino Cinco on the evening of July 27, 2011.  Tr. at 67-68, 94.  He also testified that he saw the truck parked in the same location when he returned to 325 Camino Cinco in the early morning hours of July 28, 2011, though he admitted that it was too dark for him to confirm that the license plate was the same.  Tr. at 69, 95, 102.  The testimony in the record also explains that the GPS does not always accurately pinpoint a vehicle's location at a specific address, which is why agents must go in person to verify the location of a car that is under surveillance.  Tr. at 55, 57, 64-65.  Furthermore, the statement by Lorenzo Robles that he drove the Nissan Titan only on the weekends was undermined by the undisputed fact that on Wednesday, August 3, 2011—the day the warrant was executed at 325

Camino Cinco—Robles was getting in the truck to drive it to work.  Tr. at 81, 111, 290-292.

### 4.       Fito's Certification and Reliability

The warrant affidavit states, "Officer Ramon advised that Fito is trained to alert to the presence of illegal narcotics."  Ex. 1 at ¶ 18.  Defendant contends that the warrant affidavit misrepresents Fito's ability to serve as a drug sniffing dog, complaining that the affidavit fails to state that Fito was certified.  While it is true that the affidavit does not make that assertion, it is also true (as discussed above) that there is no evidence that Fito was properly certified as a drug-sniffing canine.  Thus, the affidavit contains no misrepresentation on that score.  On the other hand, the affidavit failed to inform the magistrate judge that Fito lacked proper certification.  That is a material omission, given the Tenth Circuit's statement that "[a]s a general rule, a search warrant based on a narcotics canine alert will be sufficient on its face if the affidavit states that the dog is trained *and certified* to detect narcotics."  *United States v. Kennedy*, 131 F.3d 1371, 1376–77 (10th Cir. 1997) (citations omitted) (emphasis added).  Having failed to inform the magistrate judge that Fito lacked certification, Godier should have offered other assurance of Fito's reliability or informed the judge of its absence.  For this additional reason, in accordance with *Franks* Fito's July 28, 2011 alert should be stricken from the affidavit.

## III.     THE GOOD FAITH EXCEPTION

### A.       <u>The Law</u>

The sole purpose of the exclusionary rule—a judicially created remedy that bars the government from introducing evidence obtained through illegal searches and seizures—is to deter future law enforcement officers from violating the Fourth Amendment.  *Davis v. United States*, 564 U.S. ——, 131 S.Ct. 2419, 2426 (2011).  But the exclusionary rule is not absolute.  *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("Suppression of evidence, ... has always been our last resort,

not our first impulse.").  In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court created

the good-faith exception to the exclusionary rule, "which allows admission of evidence 'seized in

reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'"

*United States v. Evers*, 669 F.3d 645, 654 (6th Cir. 2012) (citation omitted). Since *Leon*, the

Supreme Court has elaborated on the scope of the exclusionary rule.  *Davis v. United States*, 564

U.S. ---, 131 S.Ct. 2419, 2426 (2011); *Herring v. United States*, 555 U.S. 135 (2009).  In *Herring*,

the Supreme Court reiterated that "suppression is not an automatic consequence of a Fourth

Amendment violation."   555 U.S. at 137. In doing so, the Court discussed *Leon* extensively,

concluding:

> When police act under a warrant that is invalid for lack of probable cause, the
> exclusionary rule does not apply if the police acted 'in objectively reasonable
> reliance' on the subsequently invalidated search warrant. We (perhaps confusingly)
> called this objectively reasonable reliance 'good faith.'"

*Herring*, 555 U.S. at 142. Thus, even assuming a Fourth Amendment violation:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that
> exclusion can meaningfully deter it, and sufficiently culpable that such deterrence
> is worth the price paid by the justice system. As laid out in our cases, the
> exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct,
> or in some circumstances recurring or systemic negligence.

*Id*. at 144.  *Herring* also makes clear that in analyzing the applicability of the good-faith exception,

"we must consider the actions of all the police officers involved," *id*. at 140 (quoting *Leon*, 468 U.S.

at 923 n. 24).

### B.      Evidence in the Warrant Affidavit to be Considered

As explained above, the Court must determine whether the evidence outlined within the four

corners of the affidavit is sufficient to support probable cause.  *Whiteley v. Warden, Wyo. State*

*Penitentiary*, 401 U.S. at 565 n. 8.  This case presents a situation in which a defendant seeks to

suppress evidence obtained pursuant to a search warrant containing some information discovered in a manner that has been held to violate the Fourth Amendment. The question is whether the *Leon* good-faith exception applies when officers act pursuant to a search warrant that is based on an illegal predicate search.

### 1.      GPS Data

The Court has ruled, *supra*, that the GPS data discussed in the warrant as well as the July 28, 2011 alert by narcotics canine Fito in Paragraph 18 should be excised from Godier's warrant affidavit in determining whether the affidavit supports a finding of probable cause.  However, the Government argues that the GPS data still should be included in the analysis pursuant to the good faith exception.  Citing *Leon*, *Herring*, and other decisions, the Government argues that suppression of evidence is not an automatic consequence of a Fourth Amendment violation, but rather a judicially created remedy that has never been applied except where its deterrence benefits outweigh its substantial social costs.  Doc. 75 at 7-8 (citations and quotations omitted).  According to the Government, although at the time of investigation of Defendant the Tenth Circuit had not addressed the question of whether tracking by GPS constitutes a search, its agents relied on established precedents from the Courts of Appeals for the Seventh and Ninth Circuits, as well as various federal district courts, which held that placing GPS tracker on a vehicle was not a search requiring a warrant.[12]  *Id*. at 9.  Thus, it contends that there was no flagrant, reckless, or grossly negligent police

---

[12] The Seventh and Ninth Circuit decisions include *United States v. Cuevas–Perez*, 640 F.3d 272 (7th Cir. 2011); *United States v. Pineda–Moreno*, 591 F.3d 1212 (9th Cir. 2010); and *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007).  The Eighth Circuit had stated that "when police have reasonable suspicion that a particular vehicle is transporting drugs, a warrant is not required when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time."  *United States v. Marquez*, 605 F.3d 604, 609–10 (8th Cir. 2010).  In addition, during the weeks leading up to the August 3, 2011 search of 325 Camino Cinco, the Fifth Circuit decided *United States v. Hernandez*, 647 F.3d 216, 220-21

conduct to be deterred because the agents acted in the reasonable, good faith belief that their conduct was lawful.  *Id*. at 8.

The Tenth Circuit's opinion in *United States v. McCane, 573 F.3d* 1037 (10th Cir. 2009) is instructive.  A police officer stopped McCane for a suspected traffic violation and then determined that he was driving under a suspended license.  As a result, the officer arrested McCane, handcuffed him, and placed him in the back seat of the patrol car. The officer then conducted a search of the passenger compartment of the vehicle and discovered a gun.  McCane was charged with being a felon in possession of a firearm, but he filed a motion to suppress the firearm as fruit of an unlawful search. The district court denied the motion, concluding that under settled Tenth Circuit precedent, the search was properly undertaken as incident to a lawful arrest.  While the case was pending on appeal, the Supreme Court issued its decision in *Arizona v. Gant*, 556 U.S. 332 (2009).  In *Gant*, the Court concluded a vehicle search is not valid as incident to a lawful arrest when a defendant is stopped for a traffic violation and handcuffed in the back of the patrol car at the time of the search. *Id*. at 343.  In light of *Gant*, the Tenth Circuit concluded that the district court erred in concluding the search was valid as incident to a lawful arrest.  Despite this, it affirmed the district court's denial of the motion to suppress based upon the good-faith exception to the exclusionary rule.  The *McCane* court explained:

> The exclusionary rule is not an individual right and applies only where it results in appreciable deterrence.  Because the purpose of the exclusionary rule is to deter police misconduct, in determining whether to apply the rule the court is to weigh the benefits of the resulting deterrence against the costs of applying the rule.  The

(5th Cir. 2011) (Jones, J.), in which the Court held that the government's use of a GPS device on defendant's truck in order to track his movements did not constitute an unconstitutional warrantless search.  This Court is aware of only one Circuit Court decision issued prior to August 3, 2011—*United States v. Maynard*, 615 F.3d 544, 560 (D.C. Cir. 2010)—declaring the use of a GPS device on a vehicle to be a search requiring a valid warrant.

principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system. Consequently, the rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging its application.

573 F.3d at 1042 (internal citations and quotations omitted).  After reviewing Supreme Court cases

on the good faith exception, the Tenth Circuit summarized as follows:

Two inseparable principles have emerged from the Supreme Court cases and each builds upon the underlying purpose of the exclusionary rule: deterrence. First, the exclusionary rule seeks to deter objectively unreasonable police conduct, i.e., conduct which an officer knows or should know violates the Fourth Amendment. Second, the purpose of the exclusionary rule is to deter misconduct by law enforcement officers, not other entities, and even if it was appropriate to consider the deterrent effect of the exclusionary rule on other institutions, there would be no significant deterrent effect in excluding evidence based upon the mistakes of those uninvolved in or attenuated from law enforcement.  Based upon these principles, we agree with the government that it would be proper for this court to apply the good-faith exception to a search justified under the settled case law of a United States Court of Appeals, but later rendered unconstitutional by a Supreme Court decision. . . . The refrain in *Leon* and the succession of Supreme Court good-faith cases is that the exclusionary rule should not be applied to objectively reasonable law enforcement activity.  Relying upon the settled case law of a United States Court of Appeals certainly qualifies as objectively reasonable law enforcement behavior.

*Id*. at 1044-45 (internal citations and quotations omitted).

There is a significant difference between *McCane* and this case, however—in *McCane*, the

police were following established Tenth Circuit precedent by which they were bound.  In this case,

at the time the agents were conducting their investigation and placing a GPS device on the

Defendant's Lincoln Navigator, the Tenth Circuit had not spoken on the question of whether the use

of a GPS device on a vehicle constitutes a search, and the Supreme Court had not yet announced its

decision in *Jones* .  On the other hand, as explained in footnote 12, *supra*, the Seventh and Ninth

Circuits had held that law enforcement officers' use of a GPS device on a vehicle was not a search.

Similarly, the Eight Circuit had agreed that, at least under certain circumstances, use of such a

device was not a search.  During the relevant time period for this case, only the D.C. Circuit

disagreed.  Given this split in circuit authority the question is, what is reasonable for officers under those circumstances, and how does one analyze and apply the costs and benefits of suppression?

As the Tenth Circuit instructed in *McCane*, "the exclusionary rule seeks to deter objectively unreasonable police conduct, i.e., conduct which an officer knows or should know violates the Fourth Amendment." *Id*. at 1044.  This Court cannot conclude that given the legal landscape at the time the officers' use of a GPS device without a warrant was objectively unreasonable.  If the experienced, thoughtful, and knowledgeable jurists of the Seventh, Eighth, and Ninth Circuits did not know that the use of a GPS device on a vehicle constituted a warrantless search in violation of the Fourth Amendment, then it is not reasonable to assert that the officers involved in the underlying investigation in this case should have known that either.  Indeed, during the relevant period the D.C. Circuit had expressed a contrary view, but this is not a case in which the officers followed one circuit's minority approach that was heavily outweighed by the a majority of opinions in other circuits.  Given the then-existing legal landscape, the Court concludes that officers' use of the GPS device without a warrant was not objectively unreasonable, and as a result the primary reason for the exclusionary rule–to deter unreasonable police conduct–would not be served by suppression of the evidence.  As a result, when it makes its determination as to whether the facts in the warrant affidavit support probable cause to search 325 Camino Cinco, the Court will not excise the information that was obtained by placing a GPS device on Defendant's Lincoln Navigator.

### 2.      July 28, 2011 Alert by Canine Fito

The Tenth Circuit "has recognized the collective-knowledge doctrine (also called the 'fellow officer' rule)." *United States v. Wilkinson*, 633 F.3d 938, 941 (10th Cir. 2011).  Under that doctrine, "the knowledge and reasonable suspicions of one officer can be imputed to another." *United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012).  The Government does not dispute that the

33

collective knowledge doctrine applies in this case.  Thus, Agent Godier is presumed to have all the knowledge possessed by the other officers with whom he collaborated and from whom he received information to support his affidavit.  This includes Anthony Ramon, the handler for canine Fito. Under the current record, it is reasonable to presume that Ramon knew that Fito was not properly certified, since Ramon himself signed the certification.  It is also reasonable to presume that Ramon knew that neither he nor his employer retained records tracking Fito's reliability, either in training exercises or in the field.  That knowledge is imputed to Godier, who failed to inform the magistrate judge that Fito was not properly certified or that there was no record documenting Fito's reliability as a drug sniffing canine.  This was a material omission from the affidavit that would have had a significant impact on the magistrate judge's probable cause analysis.  Under these circumstances, the good faith doctrine cannot support the inclusion of Fito's alert to the trash found outside 325 Camino Cinco when considering whether the facts in the affidavit support probable cause to search that house.

## IV.    STALENESS

"Probable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the placed to be searched."  *United States v. Snow*, 919 F.2d 1458, 1459 (10th Cir. 1990).  Information's staleness "depends upon 'the nature of the criminal activity, the length of the activity, and the nature of the property to be seized.' "  *United States v. Riccardi*, 405 F.3d 852, 860–61 (10th Cir. 2005) (quoting *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990)).  "'[O]ngoing and continuous activity makes the passage of time less critical when judging the staleness of information upon which a search warrant is based,' . . . because evidence of a longstanding pattern of repeated activity makes it less likely that the activity has ceased within a short time frame."  *Roach*, 582 F.3d at 1201 (quoting *United States v. Mathis*, 357 F.3d 1200, 1207

(10th Cir. 2004)).  In addition, "otherwise stale information may be refreshed by more recent events."  *United States v. Cantu*, 405 F.3d 1173, 1178 (10th Cir. 2005).

In this case, the application for search warrant was made on Friday, July 29, 2011, and the judge who issued the warrant required that officers execute it on or before August 7, 2011.  The agents in fact executed the warrant five days after it was issued, on Wednesday, August 3, 2011.  Defendant argues that the information in Agent Godier's warrant affidavit was stale by the time the warrant was executed.  He points out that the only evidence of wrongdoing at 325 Camino Cinco was the July 28, 2011 trash pull, and that occurred six days before the warrant was executed.  Citing a case from the Sixth Circuit, Defendant argues that "in the context of drug crimes, information goes stale very quickly because drugs are usually sold and consumed in a prompt fashion."  Doc. 49 at 25 (citing *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009)).  The Government, in turn, admits that some of the information in the warrant affidavit was stale, but contends that this information was included merely to provide context for the more recent facts supporting probable cause.  Doc. 31 at 15.

The Court concludes that the information in the warrant affidavit was not stale.  The agents and officers were investigating an alleged ongoing criminal drug distribution ring.  Over a period of months, that investigation led them from the Westside Café to various homes.  Police first saw suspected drug packaging materials in the trash at the 10301 Solitude home in February of 2011, and then tracked Defendant's vehicle from that residence to the apartment at 1632 Bridge and then on to 325 Camino Cinco.  Police then observed suspected drug packaging materials, including plastic wrap and vacuum seal bags, in the trash in front of 325 Camino Cinco on July 28, 2011.  The passage of six days between the observation of those items and the execution of the search warrant is reasonable.  Where there is reason to believe criminal activity is ongoing, the passage of time is

not critically important.  *United States v. Jardine*, 364 F.3d 1200, 1205 (10th Cir. 2004), *vacated on other grounds*, 543 U.S. 1102 (2005).

## V.    PROBABLE CAUSE

"A search warrant must be supported by probable cause, requiring 'more than mere suspicion but less evidence than is necessary to convict.' "  *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000) (quoting *United States v. Burns*, 624 F.2d 95, 99 (10th Cir. 1980)).  Before a court can issue a search warrant, "the judicial officer issuing such a warrant [must] be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant."  *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564 (1971).  "In reviewing whether probable cause existed for issuing a search warrant, [t]he test is whether the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched."  *United States v. Tisdale*, 248 F.3d 964, 971-72 (10th Cir. 2001) (internal quotations omitted)(quoting *United States v. Nolan*, 199 F.3d 1180, 1183 (10th Cir. 1999)).  Furthermore, " '[p]robable cause undoubtedly requires a nexus between [the contraband to be seized or] suspected criminal activity and the place to be searched.' "  *United States v. Rowland*, 145 F.3d 1194, 1203 (10th Cir. 1998) (quoting *United States v. Corral–Corral*, 899 F.2d 927, 937 (10th Cir. 1990)).  Where the police do not present oral testimony to the reviewing magistrate, the appellate court must ascertain the existence of probable cause to support a warrant exclusively from the affidavit's four corners.  *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. at 565 n. 8.  Although the reviewing court "should afford a magistrate's probable cause decision great deference," it should "not defer if there is no 'substantial basis for concluding that probable cause existed.' "  *United States v. Danhauer*, 229 F.3d at 1006 (quoting *United States v. Rowland*, 145 F.3d at 1204).

Defendant argues that misrepresentations in the warrant affidavit "along with the fact that agents were not able to connect the home to any criminal activity," preludes a finding that the warrant contains sufficient facts to support probable cause to search 325 Camino Cinco.  Doc. 49 at 25.  The Court agrees.  Once the July 28, 2011 canine alert to the trash seized from 325 Camino Cinco is excised from the warrant, the remaining facts are insufficient to support a conclusion that evidence of a crime would be found inside the home at that address.

The remaining facts from the four corners of the warrant affidavit show that the CS reported a connection between the Westside Café and a narcotics trafficking ring, which led police to Adriana Castillo and the residence on Solitude, where they first observed the Lincoln Navigator.  In January of 2011, police observed some suspicious activity at the Solitude home, including the use of a security camera, unspecified drug packaging materials in the trash, and the successful removal by three Hispanic males of a GPS device placed on a vehicle parked in front of the house.  In February of 2011, agents saw vacuum seal bags as well as cut plastic and tape in the shape of a shoe sole—common packaging materials for heroin smuggling—in the trash at 10301 Solitude.  Adriana Castillo told agents that the house on Solitude was her boyfriend's home.  In March of 2011, agents followed Ms. Castillo to her apartment at 1632 Bridge SW in Albuquerque, where on several occasions they observed the same Lincoln Navigator with license plate LBC-905 parked during the early morning hours.  During this time frame, agents saw an Hispanic man retrieve a black bag from the Lincoln Navigator and then return to the apartment.  In July of 2011, agents used a GPS tracker to locate the Lincoln Navigator at 325 Camino Cinco SW in Albuquerque.  They also observed a silver Nissan Titan truck at Camino Cinco that they had seen parked in front of the apartment at 1632 Bridge.  On July 28, 2011, both the Lincoln Navigator and the Nissan Titan were present at 325 Camino Cinco.  On that date, Sergeant Shelton found suspected drug packaging materials,

which included pieces of plastic wrap and pieces of vacuum seal bags, in the trash located on the curb in front of 325 Camino Cinco.

In the absence of the narcotics canine alert, the foregoing facts do not adequately support a reasonable belief that evidence of a crime would be found at 325 Camino Cinco. There are no facts as to who lived in the home, nor is there any averment that agents saw the same Hispanic man or men at 325 Camino Cinco that they had seen at either 1632 Bridge or 10301 Solitude. The only reasons that agents believed that evidence of drug trafficking could be found at 325 Camino Cinco were (1) the presence of the Lincoln Navigator, which had been seen at 10301 Solitude and 1632 Bridge; (2) the presence of the Nissan Titan, which they had seen at 1632 Bridge; and (3) the presence of "plastic wrap and pieces of vacuum seal bags" in the trash at 325 Camino Cinco. Unlike the shoe sole-shaped plastic materials found in the trash eight months earlier at 10301 Solitude, the trash at Camino Cinco is non-descript. The affidavit does not explain why generic plastic wrap and vacuum seal bags are suspected drug trafficking materials. Without the canine alert, the agents had no more evidence of drug trafficking at 325 Camino Cinco than they had at 10301 Solitude, where they did not seek a warrant to search. The Court concludes that without the canine alert, probable cause to search 325 Camino Cinco is lacking.

## VI.    Good Faith Reliance On the Magistrate's Approval of the Warrant

The Government bears the burden of demonstrating that its agents' reliance upon the warrant was objectively reasonable. *United States v. Cook*, 854 F.2d 371, 373 (10th Cir. 1988) (quoting *United States v. Michaelian*, 803 F.2d 1042, 1048 (9th Cir. 1986)). *Leon* noted four situations in which the good-faith exception would not apply because reliance on the warrant by the officers would not be objectively reasonable: (1) if the affidavit for the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; (2) if the issuing

magistrate was "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth"; (3) if the magistrate "wholly abandoned his judicial role"; and (4) if a warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." 468 U.S. at 923 (internal quotation marks omitted).  Defendant argues that the first and second exceptions apply here.

With regard to the second exception, the Court concludes that the warrant affidavit misled the issuing magistrate judge.  While it is technically correct that the affidavit does not state that Fito was certified or that he was reliable, it does say that he was a trained narcotics detection canine. Thus, it *suggests* to the magistrate judge that the canine had the proper certification and was reliable. For the government to claim that it is entitled to the benefit of the good faith exception because it did not technically mislead the magistrate judge but instead merely omitted relevant information about the canine in question is unacceptable.  As discussed above, the good faith exception does not apply in these circumstances.

Defendant also argues that Agent Godier's warrant affidavit was so lacking in indicia of probable cause such that no reasonable officer would have believed the search to be legal, despite the magistrate judge's authorization.  Doc. 28 at 18.  This lack of probable cause, argues Defendant, stems from the lack of a nexus between criminal activity and 325 Camino Cinco.  *Id*. at 18-19.  The nexus required for the good faith exception is less than that for a finding of probable cause.  The Tenth Circuit has held that "good faith may exist when a minimal nexus between the place to be searched and the suspected criminal activity is established."  *United States v. Gonzales*, 399 F.3d 1225, 1231 (10th Cir. 2005).  Again, the Court concludes that without a valid alert by a narcotics canine to the trash pulled from 325 Camino Cinco, the warrant affidavit lacks even the minimally required nexus required to find probable cause.  Thus, the good faith exception does not apply for

this reason as well.

   **IT IS THEREFORE ORDERED** that for the reasons more fully discussed herein,

Defendant Agustin Aispuro-Haros' Motion to Suppress [Doc. No. 28] is **GRANTED**.


_____
   **UNITED STATES DISTRICT JUDGE**